**BRODSKY & SMITH, LLC**
Evan J. Smith, Esquire
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Phone:  (877) 534-2590
Facsimile: (610) 667-9029
esmith@brodsky-smith.com

*Attorneys for Plaintiff Michael Wadsworth*

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

|  |  |
|---|---|
| MICHAEL WADSWORTH, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELECTRO RENT CORPORATION, DANIEL GREENBERG, NANCY Y. BEKAVAC, KAREN J. CURTIN, THEODROE E. GUTH, JOSEPH J. KEARNS, JAMES S. PIGNATELLI, PLATINUM EQUITY, LLC, ELECOR INTERMEDIATE HOLDING II CORPORATION, and ELECOR MERGER CORPORATION.<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND**<br>MI |

Plaintiff, Michael Wadsworth ("Plaintiff"), by his attorneys, on behalf of himself and those similarly situated, alleges upon personal knowledge as to his own acts and upon information and belief as to all other matters, based upon the investigation made by and through his attorneys, which investigation included, *inter alia*, the review of United States Securities and Exchange Commission ("SEC") filings, press releases, analyst reports, news articles and other materials, as follows:

## NATURE OF THE CASE

1.     Plaintiff brings this stockholder class action on behalf of himself and all other public stockholders of Electro Rent Corporation ("Electro" or the "Company"), against Electro, the Company's Board of Directors (the "Board" or the "Individual Defendants"), Platinum Equity,

1    LLC, and its affiliates Elecor Intermediate Holding II Corporation ("Merger Sub 1") and Elecor

2    Merger Corporation ("Merger Sub 2")(collectively, "Platinum") (collectively with Electro and the

3    Board, the "Defendants"), in connection with their attempt to sell the Company to Platinum by

4    means of an unfair process and for an unfair price.  Plaintiff also brings claims against Defendants

5    for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the

6    "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

7        2.      On May 31, 2016, Electro and Platinum jointly announced that they had entered

8    into an Agreement and Plan of Merger (the "Merger Agreement") that will culminate in Platinum,

9    through Merger Sub 1 and Merger Sub 2, acquiring all of the outstanding shares of Electro.  Under

10    the terms of the merger agreement, Electro public stockholders will receive $13.12 in cash for

11    every share of Electro common stock held, for an approximate aggregate value of $323.4 million

12    (the "Proposed Acquisition").

13        3.      By approving the Proposed Acquisition, the Individual Defendants have breached

14    their fiduciary duties of loyalty, good faith, due care and disclosure by, *inter alia*, (i) agreeing to

15    sell Electro without first taking steps to ensure that Plaintiff and Class members (defined below)

16    would obtain adequate, fair and maximum consideration under the circumstances; and (ii)

17    engineering the Proposed Acquisition to benefit themselves and/or Platinum without regard for

18    Electro public stockholders.  Accordingly, this action seeks to enjoin the Proposed Acquisition and

19    compel the Individual Defendants to properly exercise their fiduciary duties to Electro

20    stockholders.

21        4.      Significantly, Defendant Daniel Greenberg ("Greenberg"), or members of his

22    immediate family, own approximately 29% of the Company's outstanding common stock, which

23    Greenberg is able to effectively control.  Greenberg, who publicly announced his impending

24    retirement during the sales process, exercises both a high level of voting control over the Company,

25    as well as a high level of non-voting influence due to his near forty-year tenure as Chairman and

26    CEO of the Company.  Greenberg's control of Electro is so thoroughly entrenched that the other

27    Directors serve at his whim, calling into question the price and the process by which the Merger

28    Agreement was reached.

CLASS ACTION COMPLAINT

5.      Such control on Greenberg's part demands the Court cast a jaundiced eye on the Company's self-serving representations regarding the Merger Agreement that a special committee of the company's board of directors, comprised of independent directors recommended the Proposed Acquisition.    Certainly, the recommendation came as no surprise given the overwhelming influence held at all times by Greenberg.

6.      Furthermore, the Individual Defendants, as defined herein, have exacerbated their breaches of express and implied contractual duties and fiduciary duty by agreeing to lock up the Merger with preclusive and onerous deal protection devices that preclude other bidders from making successful competing offers for the Company and act to render the Merger a fait accompli. For example, the Board agreed to: (i) a "no solicitation" provision that prevents the Company from negotiating with or providing confidential information to competing bidders except under extremely limited circumstances; (ii) a "matching rights" provision that allows Platinum to match any competing proposal in the unlikely event that one emerges; and (iii) up to $11,300,000 in termination fees if the Board agrees to a competing proposal.

7.      Finally, in the Schedule 14A Preliminary Proxy Statement filed with the Securities and Exchange Commission ("SEC") on June 7, 2016 (the "Proxy"), defendants failed to disclose all material information necessary for Electro stockholders to make an informed decision regarding the Proposed Acquisition.  Specifically, the Proxy omits and/or misrepresents material information concerning, among other things: (1) the background of the Proposed Acquisition; (2) the data and inputs underlying the financial valuation exercises that purportedly support the so-called "fairness opinions" provided by Electro's financial advisor, Houlihan Lokey Capital, Inc. ("Houlihan Lokey"); and (3) Electro's financial projections, relied upon by Houlihan Lokey.

8.      Notably, as evidenced by the Proxy, the sales process leading up to the Proposed Acquisition was rife with actions so favored to Platinum that they could have only been intentional or reckless on the part of the Special Committee.  For example, in an effort to communicate to an interested bidder while under the final days of an exclusivity agreement with Platinum, the Company entered into a completely one-sided arrangement where they would have had to pay Platinum, in essence, a termination fee before any definitive merger agreement was signed.

Furthermore, Platinum was also given what amounted to a matching rights provision at this premature point as well.  Thus, the deal was locked up in favor of Platinum before it was even executed.

9.    Consequently, the Individual Defendants have breached their fiduciary duties of loyalty and due care, aided and abetted by Platinum.

10.    Absent judicial intervention, the merger will be consummated, resulting in irreparable injury to Plaintiff and the Class.  This action seeks to enjoin the unreasonable steps taken by Defendants in entering into the merger agreement without attempting to maximize stockholder value in order to obtain millions of dollars in benefits for themselves.  Immediate judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.  Plaintiff, on behalf of the Class, seeks only to level the playing field and to ensure that if stockholders are to be ultimately stripped of their respective equity interests through the Proposed Acquisition, that the Proposed Acquisition is conducted in a manner that is not overtly improper, unfair and illegal, and that all material information concerning the Proposed Acquisition is disclosed to the Electro stockholders so that they are able to make informed decisions as to whether to vote in favor or against the Proposed Acquisition.

## PARTIES

11.    Plaintiff, Michael Wadsworth, is an individual.  The Plaintiff is, and at all times relevant hereto, has been an Electro stockholder and is a resident of California.

12.    Defendant Electro is a California corporation with its principle place of business located at 6060 Sepulveda Boulevard, Van Nuys, CA 91411-2512.  Electro rents, leases, and sells new and used electronic test and measurement ("T&M") equipment primarily for use in the aerospace and defense, telecommunications, electronics, industrial, and semiconductor markets.  The company operates through two segments, T&M and data products ("DP").  Its equipment portfolio includes general purpose T&M instruments, personal computers, workstations, tablets, and servers.  Electro common stock is publicly traded on the NasdaqGS under the symbol "ELRC."  As of April 7, 2016, there were over 24 million common shares of Electro stock outstanding.

CLASS ACTION COMPLAINT

13.     Defendant Daniel Greenberg ("Greenberg") has been a director of the Company at all relevant times.  Additionally, Greenberg serves as the Chief Executive Officer ("CEO") of the Company and as the Chairman of the Board.  Defendant Greenberg, along with members of his immediate family, owns/controls approximately 29% of the outstanding shares of Electro stock.

14.     Defendant Nancy Y. Bekavac ("Bekavac") has been a director of the Company at all relevant times.  Additionally, Bekavac serves as the Chair of the Nominating Committee and as a member of the Compensation Committee.

15.     Defendant Karen J. Curtin ("Curtin") has been a director of the Company at all relevant times.   Additionally, Curtin serves as a member of the Audit, Nominating, and Compensation Committees.

16.     Defendant Theodore E. Guth ("Guth") has been a director of the Company at all relevant times.  Additionally, Guth serves as the Chair of the Compensation Committee.

17.     Defendant Joseph J. Kearns ("Kearns") has been a director of the Company at all relevant times.  Additionally, Kearns serves as the Chair of the Audit Committee and as a member of the Nominating and Compensation Committees.

18.     Defendant James S. Pignatelli ("Pignatelli") has been a director of the Company at all relevant times.  Additionally, Pignatelli serves as a member of the Audit, Nominating, and Compensation Committees.

19.     Defendants Greenberg, Bekavac, Curtin, Guth, Kearns, and Pignatelli identified in ¶¶ 13-18 are collectively referred to as the "Individual Defendants."  By reason of their positions as officers and/or directors of the Company, the Individual Defendants are in a fiduciary relationship with plaintiff and the other Electro public stockholders, and owe plaintiff and other Electro stockholders the highest obligations of loyalty, good faith, fair dealing, due care, and full and fair disclosure.

20.     Defendant Platinum Equity, LLC is a private Delaware Limited Liability Company with principle offices located at 360 North Crescent Drive, Beverly Hills, CA 90210.  Platinum Equity, LLC is a private equity firm specializing in investments in mergers and acquisitions, special situations, buyouts, operational turnarounds, mature, middle markets, public-to-private

CLASS ACTION COMPLAINT

transactions, corporate divestitures, underperforming or undervalued businesses, and add-on acquisitions.  It invests in companies that provide mission-critical products, services, and solutions in diverse industries including industrials, manufacturing, distribution, information technology services and software, telecommunications, transportation and logistics, media, equipment rental, entertainment, healthcare services, and metals services.  The firm focuses on investments in North America and Western Europe.

21.     Defendant Merger Sub 1 is a Delaware Corporation and wholly owned subsidiary of Platinum Equity, LLC created for the sole purpose of effectuating the Proposed Acquisition.  It can be served care of The Corporation Trust Company, its registered agent, at 1209 Orange St., Wilmington, DE 19801.

22.     Defendant Merger Sub 2 is a California Corporation and wholly owned subsidiary of Platinum Equity, LLC created for the sole purpose of effectuating the Proposed Acquisition.  It can be served care of CT Corporation System, its registered agent, at 818 West Seventh St., Ste. 930, Los Angeles, CA 90017.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as this Complaint alleges violations of Rule 14(a).  This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

24.     Venue is proper in this Court because the Defendants reside, are found, have agents and regularly transact business in this District as provided in 28 U.S.C. § 1391(b) and (c).

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

25.     Electro rents, leases, and sells new and used electronic test and measurement ("T&M") equipment primarily for use in the aerospace and defense, telecommunications, electronics, industrial, and semiconductor markets.  The company operates through two segments, T&M and data products ("DP").   Its equipment portfolio includes general purpose T&M

CLASS ACTION COMPLAINT

1   instruments, personal computers, workstations, tablets, and servers.

2        26.    Electro has a demonstrated history of financial success, recently evidenced by its

3   Fiscal 2016 Q3 financials which were released on April 13, 2016.  Notably, the Company saw a

4   Q3 profit of $1 million or 4 cents per share, and an increase in total cash of approximately $14.17

5   million year-on-year.

6        27.    Discussing these results, Defendant Greenberg noted positively that the Company

7   had "worked to reduce operation costs" during the quarter.  Speaking on the positive future outlook

8   of the Company and prospects for growth he commented positively on the increased demand in

9   the aerospace and defense sector.

10        28.    For Electro, financial success is not a recent state of affairs; rather the Company

11   has posted strong financials for some time.  For example, on October 8, 2015 the Company

12   reported its Fiscal 2016 Q1 financials, which showcased profits of $2.5 million or 10 cents per

13   share.

14   ***The Flawed Process Leading to the Proposed Acquisition***

15        29.    Between April 2011 and January 2013, the Board of Directors formed special

16   committees on two separate occasions to consider and evaluate various potential strategic

17   alternative available to Electro.  After extensive meetings and consultation with advisors in each

18   instance, it was determined that it was in the best interest of Electro and its stockholders to continue

19   to operate as an independent entity.

20        30.    On August 12, 2014, the Board of Directors again determined to constitute a

21   strategic alternatives committee of independent directors (the "Special Committee") to gauge

22   potential strategic alternatives.  The Special Committee was composed of Defendants Guth,

23   Kearns, and Curtin, and was chaired by Guth.  The Special Committee was given broad authority

24   in regards to any evaluation of any strategic alternatives for Electro.

25        31.    On November 4, 2014, the Special Committee retained Houlihan Lokey as a

26   financial advisor with a limited engagement to provide analysis and advice related to possible

27   strategic alternatives.  Houlihan Lokey was fully engaged by the Special Committee on January

28   23, 2015.

CLASS ACTION COMPLAINT

32. From December 2014 through July 2015, the Special Committee met on several occasions with Houlihan Lokey and Electro outside counsel Sheppard, Mullin, Richter & Hampton ("Sheppard Mullin") to discuss possible strategic alternatives for Electro, Houlihan Lokey's analyses thereto, the Company's financial performance, possible strategic and financial buyers, and other related matters.

33. On February 27, 2015, the Special Committee met with members of Company management including Defendant Greenberg to discuss recent developments in the Company business. Specifically, Greenberg reported that Keysight Technologies, Inc. ("Keysight") had decided not to renew its reseller agreement with the Company after its expiration on May 31, 2015. Sales of new Keysight equipment represented approximately 29.5%, 26.5% and 29.8% of Electro's gross revenue in fiscal 2015, 2014, and 2013, respectively. Management advised the Special Committee that it would look to rebuild sales of new products by establishing relationships with other test and measurement equipment manufacturers. After reviewing and discussing this development, the Special Committee determined to suspend the potential sale process, pending evaluation of the impact of the Keysight news.

34. On July 16, 2015, the Special Committee met with members of Company management, Houlihan Lokey, and Sheppard Mullin to discuss a potential sales process of the Company. After assessing the Company's position, the Special Committee authorized Houlihan Lokey to initially contact eight potential financial buyers in order to assess the level of potential interest in acquiring Electro. The Special Committee later authorized Houlihan Lokey to contact an additional potential financial buyer.

35. On July 29, 2015, the Special Committee met to review the sales process and Houlihan Lokey's outreach, where Houlihan Lokey informed the Special Committee that all nine potential financial buyers had signed confidentiality agreements ("NDAs") with Electro.

36. On September 8, 2015, Houlihan Lokey informed the Special Committee that, of the nine potential buyers, three had submitted initial indications of interest and six had either declined to submit indications of interest or did not otherwise move forward with the process. The three initial indications contemplated the following ranges of value per Electro share: $12.44 to

CLASS ACTION COMPLAINT

$14.52 per share; $15.55 to $18.25 per share; and $15.55 to $17.42 per share.  The Special Committee, with assistance from Houlihan Lokey and Sheppard Mullin, determined to move forward in the process with the two higher bids and directed Houlihan Lokey to inform the low bidder that the Company was not forward with it at its indicated price.  The Special Committee further directed Houlihan Lokey to prepare a list of additional potential financial buyers for review by the Special Committee.

37.     On September 9, 2015, the Special Committee met to review the list of further potential bidders that Houlihan Lokey had provided, and after discussion, authorized the financial advisor to contact an additional eighteen potential financial buyers.  Houlihan Lokey contacted those eighteen potential financial buyers and two additional potential buyers, one of which was Platinum and one of which was a potential strategic buyer.

38.     Electro ultimately received initial indications of interest from four of the twenty parties contacted.  Platinum submitted an initial indication of interest at $16.25 to $17.50 per share. The other three bidders submitted initial indications of interest as follows: $14.27 to $16.05 per share; $9.33 to $9.55 per share; and $11.25 per share.   In addition, the financial buyer that submitted indications of interest prior to September 9, 2015 in the range of $12.44 to $14.52, submitted a revised indication of interest at $14.52 per share.

39.     At the request of the Special Committee, between September and November 2015, the Electro management held presentations with five potential buyers.  These consisted of all three pre-September 9 bidders and two post-September 9 bidders, including Platinum.

40.     On November 12, 2015, at the direction of the Special Committee, Houlihan Lokey distributed to four bidders, including Platinum, the form of a bid letter and draft merger agreements approved by the Special Committee with further instructions that the deadline for submission of a bid was December 15, 2015.  The fifth bidder had informed Houlihan Lokey that it had determined to withdraw from the process.

41.     On November 19, 2015, Electro received an unsolicited inquiry from "Bidder A", which indicated it was a finalist in the sales process to acquire a European-based company in the same industry as Electro, which has competing operations in the U.S. ("Company X").  Bidder A

was admitted into the process, provided access to certain non-public information regarding Electro and was provided a bid process letter.

42.     On December 14, 2015, Bidder A submitted an initial indication of interest at $15.00 per share, but also indicated due to its concurrent pursuant of Company X that it would need additional time to complete due diligence and finalize its proposal.

43.     On December 16, 2015, Platinum provided an updated proposal of $11.65 per share, which reflected a lower price compared to its previous proposed value range of $16.25 to $17.50.

44.     As of December 31, 2015, Bidder A and Platinum were continuing their due diligence, and two other potential bidders had dropped out of the process.  Due to Bidder A's concurrent efforts to acquire Company X, the Special Committee began to discuss with Sheppard Mullin and Bidder A's legal counsel concerns that a combination of Electro and Company X would be able to secure regulatory approvals in both Europe and the U.S.

45.     On January 11, 2016, executives of another company operating in the same industry as the Company ("Bidder B") made an unsolicited inquiry to management of Electro regarding a proposal to acquire the Company, who referred Bidder B to Houlihan Lokey.

46.     On January 26, 2016, Bidder B verbally communicated a proposed value of the Company at approximately $11.00 per share.  Subsequently the Special Committee informed Bidder B that Electro had concerns regarding the ability to secure regulatory approval for a combination of Electro and Bidder B, and that the proposed price of $11.00 per share was not sufficient to merit further evaluation.

47.     Throughout February 2016, the Special Committee met, with Houlihan Lokey, Sheppard Mullin attending, to discuss the sales process, including the addition of "hell or high water" covenants in any potential transaction with a strategic buyer which would require the strategic buyer to take all action necessary to secure antitrust regulatory compliance approval, including divestiture of parts of the business.

CLASS ACTION COMPLAINT

48.     On March 11, 2016, after further due diligence, Platinum submitted a revised proposal to acquire Electro for $10.70 per share, which was lower than the proposed price of $11.65 Platinum had offered on December 16, 2015.

49.     On March 14, 2016, Houlihan Lokey provided the Special Committee with information regarding the firm's relationship with Platinum and Bidder A since January 1, 2014.

50.     On March 15, 2016, Bidder A submitted a revised offer to purchase the Company at $13.00 per share, and countered the proposed "hell or high water" covenants with requirements that any resulting divestiture would have to be subject to reasonable caps, but did not specify those caps. Bidder A also stated it would need five to eight weeks to work on its financing due to the concurrent nature of its efforts to acquire Company X.

51.     Later that day the Special Committee informed Platinum that it would not move forward with it at its current bid price. In turn Platinum indicated it remained interested, and requested that the Company submit a counter-offer to its most recent bid. The Special Committee also resolved to not move forward with Bidder B absent an increase in its proposed price.

52.     On April 14, 2016, after discussions amongst the companies, Bidder A submitted an updated proposal to acquire Electro for $13.00 per share, based on an assumed level of cash and subject to adjustment up or down for any excess or shortfall. Regarding regulatory compliance, Bidder A indicated it was willing to "accept some level of risk" but did not provide further details. The bid also included a request for exclusivity to complete negotiations and prepare the necessary definitive agreements for a strategic transaction.

53.     On April 20, 2016, after consideration, the Special Committee granted Bidder A exclusivity until May 4, 2016, provided that the Special Committee could terminate exclusivity (i) on April 25, 2016, unless Bidder A provided its draft Merger Agreement by that date or (ii) on April 27, 2016 if bidder A had not extended its exclusivity agreement with Company X by that date.

54.     On April 25, 2016, Bidder A provided a draft merger agreement that did not contain any "hell or high water" provision, eliminated a liquidated damages provision for failure to secure

antitrust regulatory clearance, and requested that Bidder A be given up to nine months following signing to secure necessary regulatory approvals.

55.     On May 2, 2016, after discussion amongst itself and with Bidder A, the Special Committee provided a revised draft of the Merger Agreement to Bidder A which included a "hell or high water " covenant, addressed certain deal protective provisions and noted additional information was needed on the financing program.

56.     On May 4, 2016, exclusivity with Bidder A expired.

57.     On May 5, 2016, Platinum submitted a bid to acquire Electro for $13.00 per share, not contingent on financing.  The offer requested exclusivity to complete due diligence.

58.     On May 6, 2016, after discussion, the Special Committee determined to inform Bidder A that a potentially superior competing bid had arisen and that Electro was likely to enter into exclusivity with another party if Bidder A did not improve the terms of its proposal.  The Special Committee also determined at this time to inform Platinum that it should complete diligence, confirm its proposed purchase price and provide a draft merger agreement as a predicate to any granting of exclusivity.

59.     On May 8, 2016, Bidder a delivered a revised draft of the merger agreement including a modified "hell or high water" covenant to make divestitures, subject to (i) limitations on the revenue loss arising from such divestitures, (ii) Bidder A being able to secure a 4x EBITDA return for any assets divested, and (iii) the divestiture not having a material adverse impact on the synergies expected from the combination of Company X and Electro.  The bid also again proposed Bidder A be given nine months to secure regulatory approval.

60.     On May 9, 2016, Platinum provided a draft of a merger agreement, which contemplated voting agreements being executed by Greenberg and a member of his immediate family (representing 29% of outstanding Electro common stock) in support of a potential transaction.  In addition, the draft contained customary "no-shop" provisions, a termination fee of 4.0% of the aggregate value of the transaction, and payment of Platinum's expenses if the stockholders vote against the proposed merger.

61.     On May 13, 2016, Bidder A submitted a revised proposal.  The proposal included two possible prices, either $14.00 per share or $13.00 per share, depending on the extent of any divestitures required in connection with securing antitrust regulatory approval.  The proposal continued to include conditions to Bidder A's obligations to make a divestiture should it be necessary to obtain regulatory approval.

62.     On May 15, 2016, Platinum agreed to increase their bid to $13.12 per share in exchange for Electro agreeing that it would not be able to declare or pay any dividends for the period between signing and closing.

63.     Also on May 15, 2016, the Special Committee contacted Bidder A and informed them that Electro placed a high value on certainty of completion, that Bidder A's current proposal was subject to significant conditionality, and that Bidder A should make every effort to eliminate conditionality from its offer in order to best position itself in the process.

64.     On May 16, 2016, after discussion between Bidder A and the Company which reiterated the concerns regarding conditionality and the lack of certainty of Bidder A's bid, Bidder A agreed to reduce the required threshold on divestitures from 5x EBITDA to 4x EBITDA but did not offer other material changes.

65.     Also on May 16, 2016, the Special Committee was informed that Platinum had completed its financial diligence and confirmed its price and was requesting exclusivity to complete legal due diligence and the process.  After consideration of both Bidder A's and Platinum's offer, the Special Committee determined to grant Platinum exclusivity until May 23, 2016, provided that such exclusivity would end earlier in the event that Platinum reduced its proposed purchase price below $13.12 per share.  Prior to entry into exclusivity with Platinum, Houlihan Lokey informed Bidder A of Electro's intention to enter into exclusivity with another buyer.

66.     Additionally, on May 16, the Company announced Defendant Greenberg's planned retirement.  Per the press release, Greenberg intends to retire in July 2016.  Steven Markheim, the Company's President and COO will become CEO.  Greenberg will remain on the Board.

67.     Between May 16, and May 17, 206, Platinum and Electro exchanged drafts of the merger agreement, in which, among other things, Platinum conceded to a lower termination fee of $11.3 million and a higher damages cap of $16.2 million.  Also at this time Platinum provided a form of voting agreement which was forwarded to the Greenberg affiliated stockholders.

68.     On May 18, 2016, Bidder A sent an unsolicited letter to the Electro Board indicated that it was disappointed that Electro had entered into exclusivity with another bidder, and that bidder A was prepared to make changes to its May 13 draft of the merger agreement, including eliminating the conditional pricing, the antitrust divestiture conditions related to 4x EBITDA and the no material adverse effect on the anticipated synergies of the combination with Company X. The letter also stated that Bidder A was prepared to offer a material increase in its per share offer price.  As required by the exclusivity agreement with Platinum, Electro provided this letter to Platinum.

69.     On May 22, 2016, after discussion, the Special Committee requested from Platinum permission to seek to secure a revised offer from Bidder A before entering into a definitive agreement with Platinum.  Later that day, legal counsel for Platinum and Electro negotiated terms of the arrangement permitting the Special Committee to communicate with Bidder A regarding obtaining a revised proposal from  Bidder A, while Electro would retain an option to enter into a merger agreement with Platinum.  In exchange Electro would pay a fee to Platinum if it decided to not accept Platinum's proposal.

70.     On May 23, 2016, Platinum and Electro entered into an agreement that gave Electro the right to accept Platinum's proposal by 5:00pm Pacific on May 27, 2016 and which granted Electro the right to enter into discussions with Bidder A through the earlier of (a) 12:00pm Pacific on May 26, 2016 or (b) Electro's receipt of an updated proposal from Bidder A. Under the terms of the agreement, if bidder A provided Electro an updated proposal, Platinum would be allowed 24 hours to respond with another proposal.  Additionally, if Electro chose to not enter into a definitive transaction agreement with Platinum by 5:00 p.m. Pacific on May 27, 2016 they would be required to pay to Platinum $6,500,000.

CLASS ACTION COMPLAINT

71.     On May 26, Bidder A informed Electro that it would provide an updated proposal to acquire Electro.  Shortly thereafter, Bidder A again contacted the Company and indicated that in order for it to submit an updated proposal Bidder A would require Electro to agree to pay it a fee of $8 million in the event that another party matched the amount of its proposal.  However, after 12:00pm Pacific on May 26, Bidder A had not submitted a written proposal to Electro and, at the direction of the Special Committee, Electro informed Platinum of such.

72.     On May 27, 2016, at a Special Committee meeting with representatives from Houlihan Lokey, Sheppard Mullin, and all other Company Board members in attendance, the current state of the process and strategic alternatives available to the Company were discussed.  At the meeting Houlihan Lokey reviewed and discussed their financial analyses with respect to Electro and the proposed Platinum transaction, and ultimately verbally rendered its opinion that such a transaction was fair, from a financial point of view, to holders of Electro common stock.  After discussion, the Special Committee unanimously determined to recommend to the board that (a) the merger was fair to and in the best interests of Electro and the stockholders, (b) that the Board approve the merger and merger agreement and (c) that the Board recommend that Company stockholders vote in favor of the Proposed Acquisition.

73.     Shortly thereafter, the full Company Board met, with the Special Committee reporting its recommendations to the full Board.  After discussion the Board of Directors unanimously determined that (a) the merger was fair to and in the best interests of Electro and the stockholders, (b) approved the merger and merger agreement and (c) recommended that Company stockholders vote in favor of the Proposed Acquisition in a special meeting.

74.     After the Board's meeting on May 27, the parties signed and executed the definitive transaction agreements, and Platinum and the Greenberg-affiliated stockholders signed and delivered the voting agreements.

75.     On May 31, 2016, Electro announced the Proposed Acquisition.

***The Proposed Acquisition***

76.     On May 31, 2016, Electro announced the Proposed Acquisition.  The press release stated in relevant parts:

**BEVERLY HILLS and VAN NUYS, Calif. – May 31, 2016 –** Platinum Equity and Electro Rent Corporation (Nasdaq: ELRC) today announced that they have entered into a definitive agreement under which Electro Rent would be acquired by Platinum Equity for approximately $323.4 million.

Under the agreement, Platinum Equity would acquire all of Electro Rent's common stock.  Electro Rent stockholders will receive $13.12 per share, representing a premium of 24.4% over the closing price on May 27, 2016, and 34.8% over the average closing price of Electro Rent's common stock over the past three (3) months.  In light of the agreement, Electro Rent will not pay its next quarterly common stock dividend scheduled for July 2016.

The agreement followed the unanimous recommendation of Electro Rent's board of directors.  Completion of the transaction, which is expected to close in the next 90 to 120 days, is subject to customary closing conditions, including approval of Electro Rent's stockholders and various regulatory agencies.

Electro Rent Chairman Daniel Greenberg and a member of his immediate family, who collectively own approximately 29% of the company's outstanding shares of common stock, have entered into voting agreements in support of the sale and have granted an affiliate of Platinum Equity irrevocable proxies to execute those agreements.

Steven Markheim, recently named Chief Executive Officer of Electro Rent, and Allen Sciarillo, recently named Chief Financial Officer, will retain their current roles under the ownership of Platinum Equity.

Upon completion of the transaction, Electro Rent's common stock will cease to be publicly traded.  Houlihan Lokey acted as financial advisor to the Strategic Alternatives Committee of the Board of Directors of Electro Rent and Sheppard Mullin acted as Electro Rent's legal counsel.  Latham & Watkins LLP is serving as legal counsel to Platinum Equity.

"Electro Rent has built an excellent reputation as one of the most well respected companies in its industry.  Its team of dedicated employees will continue to play an essential role in providing Electro Rent's customers and OEM partners with the first-class service for which the company is known," said Platinum Equity Partner Louis Samson.  "We look forward to working closely with the company's experienced leadership to put Electro Rent in the best position to take full advantage of future opportunities."

"We are excited to begin this new phase in Electro Rent's history, and look forward to partnering with Platinum as we continue to meet and exceed the needs of our customers and manufacturing partners around the globe," said Markheim.  "The transaction presents an outstanding opportunity for all of our stakeholders, as we should greatly benefit from additional resources and experience to further enhance our already high inventory, service and support standards.  Platinum is fully committed to our industry and to ensuring Electro Rent's success."

CLASS ACTION COMPLAINT

*The Inadequate Merger Consideration*

77.     Significantly, analyst expectations, the Company's strong market position, extraordinary growth, and positive future outlook, establish the inadequacy of the merger consideration

78.     The compensation afforded under the Proposed Acquisition to Company stockholders significantly undervalues the Company.  Pursuant to the terms of the Merger Agreement, the transaction values Company stock at approximately $13.12 per share. Significantly, *Yahoo! Finance* analysts tracking the Company have valued it at $13.00 per share, thus rendering the consideration contained in the Proposed Acquisition as being virtually without a premium to the Plaintiff and other Company stockholders.

79.     Electro's true value and the inadequacy of the merger consideration has not gone unnoticed by those in the media.  For example, *Capital Cube* posted a June 1, 2016, article which derides the Proposed Acquisition as "undervaluing" the Company.  The article further goes on to say that Electro has shown "excellent performance overall, both over the last one year as well as over the last month."  The article also praises the Company's price momentum over the last month, which it notes has been over 3% greater than the same metric over the last year.

80.     Moreover, *Capital Cube* states that Electro compares favorably to its peers, showing a lower Price/book multiple than its peers.

81.     Meanwhile, Platinum's statements regarding the Proposed Acquisition do not address the fact that the shares of Electro common stockholders are being significantly undervalued, but instead focus on how this deal will help their own company.  For example Louis Samson, Platinum equity Partner, stated "We look forward to working closely with the company's experienced leadership to put Electro Rent in the best position to take full advantage of future opportunities."

82.     In addition, it appears as though certain of the Individual Defendants may have been motivated by their own self-interest in agreeing to the Proposed Acquisition.  For example, Defendant Greenberg and his immediate family members, who collectively own approximately

29% of outstanding Company stock, stand to gain nearly ***$94 million*** in exchange for currently illiquid stock.

83.     Accordingly, and in breach of their fiduciary duties, the Board has denied Electro's stockholders the fair and adequate value of their investment by entering into the Proposed Acquisition for inadequate consideration.

### Greenberg's Undue Control Over the Company

84.     As previously stated, supra, Greenberg, either directly or indirectly, controls approximately 29% of the total voting power of all Company shares.  Furthermore, Greenberg also wields considerable influence among the other officers and Directors of Electro as a product of his near forty-year history as the Chairman and CEO of the Company.  As such, Greenberg exercised both day-to-day control over the Company's operations, and control over certain aspects of Company which were purported to be handled by "independent Directors", such as the sales process leading up to the Proposed Acquisition.  Due to this large amount of control, even those Directors described as "independent" are anything but, and in truth, serve at the discretion of Greenberg.

85.     Significantly, on May 12, 2016, during a key point in the discussions between Electro, Bidder A, and Platinum, ***and mere days before the Company entered into exclusivity with Platinum***, Electro announced in a press release that Greenberg would be retiring effective July 11, 2016.  Coupled with the fact that Greenberg stands to make nearly ***one hundred million dollars*** from the deal and his control over the Company and Board, the entire transaction appears to be unduly motivated by Greenberg's desire to immediately secure for himself a retirement fund in exchange for currently illiquid holdings, without consideration to Electro public stockholders like the Plaintiff.

### Preclusive Deal Mechanisms

86.     The Merger Agreement contains certain provisions that unduly benefit Platinum by making an alternative transaction either prohibitively expensive or otherwise impossible.  Significantly, the Merger Agreement contains a termination fee provision that requires Electro to pay up to $11.3 million to Platinum if the Merger Agreement is terminated under certain

circumstances.  Moreover, under one circumstance, Electro must pay this termination fee even if it consummates any Acquisition Proposal (as defined in the Merger Agreement) *within 12 months following the termination* of the Merger Agreement.  Finally, and further prejudicing Electro, there is no reciprocal termination fee obligation on Platinum.  The termination fee will make the Company that much more expensive to acquire for potential purchasers.  The termination fee in combination with other preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

87.     The Merger Agreement also contains a "No Solicitation" provision that restricts Electro from considering alternative acquisition proposals by, *inter alia*, constraining Electro's ability to solicit or communicate with potential acquirers or consider their proposals.  Specifically, the provision prohibits the Company from directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to consider an "*unsolicited bona fide written Acquisition Proposal"* if it constitutes or is reasonably calculated to lead to a "*Superior Proposal*" as defined in the Merger Agreement.

88.     Moreover, the Agreement further reduces the possibility of a topping offer from an unsolicited purchaser.  Here, the Individual Defendants agreed to provide Platinum information in order to match any other offer, thus providing Platinum access to the unsolicited bidder's financial information and giving Platinum the ability to top the superior offer.  Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of Platinum.

89.     Furthermore, at the same time that the Company entered into the Merger Agreement, certain large stockholders of the Company, namely Defendant Greenberg and his immediate family, entered into an agreement with Platinum, pursuant to which such individuals have agreed, among other things, to vote their shares of the Company in favor of the approval of the Merger Agreement at a meeting of the Company's stockholders to be held for the purpose of approving the Merger Agreement.  Collectively, the signatories of the Voting and Support Agreement own approximately 29% of all Company outstanding stock.  Despite these agreements affectively locking up nearly a third of the Company common stock, the Merger Agreement does not contain a protective "majority of the minority" provision.

90.     Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Acquisition and the Proposed Acquisition is the product of the Board's breaches of fiduciary duty, aided and abetted by Platinum.

***Conflicts of Interest***

91.     Company directors and officers will receive unique benefits in connection with the merger.

92.     As previously stated, Defendant Greenberg and his immediate family members, who collectively own approximately 29% of outstanding Company stock, stand to gain nearly ***$94 million*** in exchange for currently illiquid stock.

93.     Additionally, other such company insiders will receive compensation for their current illiquid shares in amounts ranging from approximately $520,000 to over $3.4 million as show in the table below:

| Name | Number of Shares of Common Stock (1) | Consideration for Cancellation of Common Stock |
|---|---|---|
| Daniel Greenberg | 4,600,434 | $ 60,357,694 |
| Craig R. Jones (2) | 82,589 | $ 1,083,568 |
| Steven Markheim | 262,368 | $ 3,442,268 |
| Herb F. Ostenberg | 35,583 | $ 466,849 |
| Allen Sciarillo | 24,549 | $ 322,083 |
| Nancy Y. Bekavac | 49,076 | $ 643,877 |
| Karen J. Curtin | 43,046 | $ 564,764 |
| Theodore E. Guth | 18,748 | $ 245,974 |
| Joseph J. Kearns | 33,078 | $ 433,983 |
| James S. Pignatelli | 39,706 | $ 520,943 |
| *Directors and Executive Officers as a Group* | 5,189,177 | $ 68,082,002 |

94.     Furthermore, upon the consummation of the Proposed Acquisition each outstanding Company option, equity award, or other right to purchase Company stock will vest and be cancelled in exchange for the right to receive the Merger consideration.  Significantly, upon information and belief, members of the Company's Board and other Company insiders collectively own thousands of such options for which they will receive immediate liquidity.

95.     The following table sets forth the aggregate number of Electro restricted stock units owned by certain Company directors and officers, as well as their estimated value payable in the Proposed Acquisition:

| | Number of Vested RSUs (1) | Number of Unvested RSUs | Accrued Unpaid Dividend Equivalents ($) | Consideration for all RSUs (including Dividend Equivalents) ($) |
|---|---|---|---|---|
| *Executive Officers* | | | | |
| Daniel Greenberg (2) | — | — | — | — |
| Craig R. Jones (3) | — | — | — | — |
| Steven Markheim | 37,825 | 32,982 | 22,354 | 951,342 |
| Herb F. Ostenberg | 16,262 | 11,321 | 9,167 | 371,056 |
| Allen Sciarillo | 2,373 | 21,051 | 7,172 | 314,495 |
| *Non-Employee Directors* | | | | |
| Nancy Y. Bekavac | 14,100 | 1,082 | 1,082 | 200,270 |
| Karen J. Curtin | 14,100 | 1,082 | 1,082 | 200,270 |
| Theodore E. Guth | 15,166 | 1,082 | 1,082 | 214,256 |
| Joseph J. Kearns | 14,100 | 1,082 | 1,082 | 200,270 |
| James S. Pignatelli | 14,100 | 1,082 | 1,082 | 200,270 |
| *Directors and Executive Officers as a Group* | 128,026 | 70,764 | 44,103 | 2,652,228 |

96.    Moreover, certain employment agreements with several Electro officers or directors are entitled to severance packages should their employments be terminated under certain circumstances.  These 'golden parachute' packages are significant, and will grant each director or officer entitled to them at the very least, hundreds of thousands of dollars, compensation not shared by Electro common stockholders.

97.    The following table sets forth the Golden Parachute compensation for certain Electro directors and officers, as well as their estimated value payable:

**Golden Parachute Compensation**

| Named Executive Officer | Cash (1)($) | Equity (2)($) | Perquisites/ Benefits (3)($) | Other (4)($) | Total (5)($) |
|---|---|---|---|---|---|
| Daniel Greenberg | — | — | — | — | — |
| Craig R. Jones | — | — | — | — | — |
| Allen Sciarillo | 520,000 | 276,189 | $7,651 | 7,172 | 811,012 |
| Steven Markheim | 800,000 | 432,724 | $16,110 | 22,354 | 1,271,188 |
| Herb Ostenberg | — | 148,532 | — | 9,167 | 157,699 |

| Named Executive Officer | Single Trigger ($) | Double Trigger ($) |
|---|---|---|
| Daniel Greenberg | — | — |
| Craig R. Jones | — | — |
| Allen Sciarillo | 283,361 | 527,651 |
| Steven Markheim | 455,078 | 816,110 |
| Herb Ostenberg | 157,699 | — |

98.     Moreover, while the Company's public stockholders will receive inadequate consideration for their stock, certain officers and directors have negotiated positions for themselves in the surviving entity.  Specifically, Officers Steven Markheim, who was recently named to take over Defendant Greenberg's role as CEO, and Allen Sciarillo recently named as the Company Chief Financial Officer ("CFO") will both continue on with the surviving entity.

99.     Thus, while the Merger is not in the best interests of Electro stockholders, it will produce lucrative benefits for the Company's officers and directors.

100.    Finally, the Proxy raises serious concerns about the decision making and fair treatment of all potential bidders in the process by the Special Committee.  Most notably, the Proxy draws question to the Special Committee's actions after receiving an unsolicited letter from Bidder A on May 18, 2016, while the Company was still under exclusivity with Platinum, indicating that Bidder A was still interested and would substantially alter their bid in favor of Electro.  Rather than allow exclusivity to end on May 23, 2016, as it was scheduled, and reengage with Bidder A, potentially garnering a much more lucrative deal for Electro stockholders, the Special Committee, for unknown reasons, extended exclusivity with Platinum and allowed the Company to enter into an arrangement with Platinum which was, in essence, a termination fee and a matching rights provision before any definitive transaction could be entered into.

101.    Notably, the $6.5 million fee that Bidder A would have had to ultimately pay to re-engage with the Company, and the option for Platinum to match any bid that Bidder A put forward all but ensured that Bidder A would not be able to submit an effective proposal.

***The Materially Misleading and/or Incomplete Registration Statement***

102.    On June 7, 2016, the Company filed with the SEC a materially misleading and incomplete Proxy which failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Acquisition.

1     *Omissions and/or Material Misrepresentations Concerning the Sales Process leading up*

2     *to the Proposed Acquisition*

3          103.     Specifically, the Proxy fails to provide material information concerning the process

4 conducted by the Company and the events leading up to the Proposed Acquisition.  In particular,

5 the Proxy fails to disclose the following information:

6             a.     What differences, if any, existed between any and all NDAs signed by the

7                 various interested third parties and Platinum and whether any of the NDAs

8                 contained "don't-ask-don't-waive" clauses, and did any such clauses

9                 contain fall-away provisions, and under what circumstances did such fall-

10                 away provisions take effect;

11             b.     What specific information regarding Houlihan Lokey's prior relationships

12                 with Platinum and Bidder A did Houlihan Lokey disclose on March 14,

13                 2016;

14             c.     The criteria for the selection of the potential financial buyers and potential

15                 strategic buyer contacted;

16              d.     Why Bidder B was allowed to participate in the process if the Company was

17                 not attempting to contact U.S. based potential strategic buyers and why the

18                 Company did not reach out to other potential strategic buyers after Bidder

19                 B contacted the Company; and

20              e.     If the exclusivity between Electro and Platinum entered into on May 16,

21                 2016 and scheduled to expire on May 23, 2016, was extended and the

22                 reasons therefor.

23             f.     How much Houlihan Lokey was paid for its prior engagement by the

24                 Special Committee in November 2014.

25

26

27

28

CLASS ACTION COMPLAINT

1
2
3

*Omissions and/or Material Misrepresentations Concerning Electro's Financial Projections and the Failure of Houlihan Lockey to Perform a Discounted Cash Flow Analysis or Disclose Such Analysis*

4   104.   The Proxy fails to provide material information concerning financial projections

5   provided by Electro's management, reviewed with Electro and relied upon by Houlihan Lokey in

6   its analyses.   Courts have uniformly stated that "projections … are probably among the most

7   highly-prized disclosures by investors.   Investors can come up with their own estimates of discount

8   rates or [] market multiples.   What they cannot hope to do is replicate management's inside view

9   of the company's prospects."   *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203

10   (Del. Ch. 2007).   Here, the Company provided shareholders with virtually no information

11   regarding its future projected performance.   In fact, the Company has already announced its Fiscal

12   2016 results for the first three quarters.   Thus, the only "projected" information would be for Q4

13   and the year.   Significantly, the Proxy does not indicate that the FY16 projections were the only

14   projections provided to Platinum or to Houlihan Lokey.   There is no reason to think that the

15   Company did not prepare projections further out past 2016 or that such forecasts would not be

16   highly material to Platinum's due diligence.

17   105.   In addition to the failure to disclose projections, it is also significant that Houlihan

18   Lokey did not prepare a Discounted Cash Flow Analysis ("DCF").   A DCF represents the present

19   value of the forecasted cash flow stream of the subject entity, is widely used by financial

20   professionals and is based on the premise that "the value of an asset is the present value of the

21   expected cash flow on the asset, discounted back at a rate that reflects the riskiness of these cash

22   flows."[1]   Here, the Proxy states that Houlihan Lokey "reviewed certain information relating to the

23   historical, current and future operations, financial condition and prospects of ELRC made available

24   to Houlihan Lokey by ELRC, ***including financial projections (and adjustments thereto) prepared***

25   ***by the management of ELRC relating to ELRC (the "Projections")."***   (Proxy at 42, emphasis

26

27

_____

28   [1] Damodaran, Aswath.   *Damodaran on Valuation*. 2nd ed.   Hoboken, NJ: John Wiley & Sons, 2006. p. 10.

added).  Moreover, Houlihan Lokey also stated in its May 27, 2016 fairness opinion letter, "[i]n addition, managements of the Company has advised us, and we have assumed, that the financial projections (and adjustments thereto) reviewed by us have been reasonably prepared in good faith on bases reflecting the best currently available estimates and judgments of such management as to the future financial results and condition of the Company, and we express no opinion with respect to such projections or the assumptions on which they are based."  Fairness Letter, Annex B to the Proxy at 2.

106.    Given that Houlihan Lokey confirmed it was provided projections regarding the future prospect of the Company and there is no statement regarding the reliability of such projections, the failure to perform a DCF is that much more acute and suspect.  In addition to disclosure of the Company's projections, there either must be disclosure of any DCF related analysis by Houlihan Lokey or explanation why the DCF was not performed.

*Omissions and/or Material Misrepresentations Concerning Houlihan Lokey's Financial Analyses*

107.    In the Proxy, Houlihan Lokey describes its fairness opinion and the various valuation analyses it performed to render its opinion.  However, Houlihan Lokey's description fails to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinion.

108.    For example, the Proxy does not disclose material details concerning the analyses performed by Houlihan Lokey in connection with the Proposed Acquisition, including (among other things):

Selected Companies Analysis (Proxy at 45-46)

i.    The criteria used by Houlihan Lokey to select the companies used in this analysis.

ii.    Whether Houlihan Lokey conducted any type of benchmarking analysis for Electro in relation to the selected companies.

iii.     The conclusions drawn by Houlihan Lokey from this analysis, including how this analysis factored into MHH's opinion that the Proposed Transaction was fair.

iv.     The specific adjustments made to EBITDA for non-recurring items.

v.     The other financial data reviewed by Houlihan Lokey in addition to LTM Adjusted EBITDA, NFY Adjusted EBITDA and NFY+ 1 Adjusted EBITDA.

Recent Transactions Analysis (Proxy at 46)

i.     The criteria used by Houlihan Lokey to select the companies used in this analysis.  This is of particular note here because in 6 of the 11 selected transactions, the Proxy indicates that for the one metric provided, TV/LTM Adjusted EBITDA, information was not available.

ii.     Whether Houlihan Lokey conducted any type of benchmarking analysis for Electro in relation to the selected transactions.

iii.     The conclusions drawn by Houlihan Lokey from this analysis, including how this analysis factored into its opinion that the Proposed Transaction was fair.

iv.     The transaction value of each selected transaction.

v.     The other financial data reviewed by Houlihan Lokey in addition to TV/LTM Adjusted EBITDA.

109.     Without the omitted information identified above, Electro's public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests.  Moreover, without the key financial information and related disclosures, Electro's public stockholders cannot gauge the reliability of

CLASS ACTION COMPLAINT

1  Houlihan Lokey's fairness opinion and the Board's determination that the Proposed Acquisition
2  is in their best interests.

3      110.    Based on the foregoing, it is clear that the Board engaged in an extremely flawed
4  sales process that failed to maximize stockholder value, and improperly served their own interests
5  at the expense of Electro's public stockholders.

6      111.    Accordingly, Plaintiff seeks the following relief on his claims related to the
7  omissions/misstatements of material information in connection with the Proposed Acquisition,
8  including: (i) enjoinment of the Proposed Acquisition; or (ii) rescission of the Proposed
9  Acquisition in the event that it is consummated and to recover damages resulting from Defendants'
10  breaches of their fiduciary duties and/or aiding and abetting same

11                    **THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES**

12      112.    By reason of the Individual Defendants' positions with the Company as officers
13  and/or directors, said individuals are in a fiduciary relationship with Plaintiff and the other public
14  stockholders of Electro and owe Plaintiff and the other members of the Class the duties of good
15  faith, fair dealing, loyalty, and candor.

16      113.    By virtue of their positions as directors and/or officers of Electro, the Individual
17  Defendants, at all relevant times, had the power to control and influence, and did control and
18  influence and cause Electro to engage in the practices complained of herein.

19      114.    Each of the Individual Defendants is required to act in good faith, in the best
20  interests of the Company's stockholders, and with due care.  To diligently comply with these
21  duties, the directors of a corporation may not take any action that:

22          a.    Adversely affects the value provided to the corporation's stockholders;

23          b.    Contractually prohibits them from complying with or carrying out their
24                fiduciary duties;

25          c.    Discourages or inhibits alternative offers to purchase control of the
26                corporation or its assets; or

27

28

CLASS ACTION COMPLAINT

d.      Will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's stockholders.

115.    Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Acquisition, violated duties owed to Plaintiff and the other public stockholders of Electro, including their duties of loyalty, good faith, independence, and candor.

## CLASS ACTION ALLEGATIONS

116.    Plaintiff brings this action as a class action, pursuant to FRCP 23, individually and on behalf of all holders of Electro common stock who are being and will be harmed by the Individual Defendants' actions, described herein (the "Class").  Excluded from the Class are Defendants and any person, firm, trust, corporation or other entity related to or affiliated with any Defendant.

117.    This action is properly maintainable as a class action.

118.    The Class is so numerous that joinder of all members is impracticable.  As of April 7, 2016, there were over 24 million common shares of Electro stock outstanding, resulting in hundreds, if not thousands of stockholders.

119.    There are questions of law and fact which are common to the Class including, *inter alia*, the following:

a.      Whether the Proposed Acquisition is unfair to the Class;

b.      Whether Plaintiff and the other members of the Class would be irreparably damaged were the transactions complained of herein consummated;

c.      Whether Defendants have breached their fiduciary and other common law duties owed by them to Plaintiff and the other members of the Class;

d.      Whether Defendants violated Federal laws;

e.      Whether the Individual Defendants are acting in furtherance of their own self-interest to the detriment of the Class;

f.      Whether the Class is entitled to injunctive relief or damages as a result of the wrongful conduct committed by the Defendants;

CLASS ACTION COMPLAINT

g.    Whether Defendants have disclosed and will disclose all material facts in connection with the Proposed Acquisition; and

h.    Whether Electro or Platinum aided and abetted the Individual Defendants' breaches of fiduciary duty owed to Plaintiff and the other members of the Class in connection with the Proposed Acquisition.

120.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

121.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

122.    Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is appropriate.

**FIRST COUNT**
**On Behalf of Plaintiff and the Class Against the Individual Defendants**
**<u>For Breach of Fiduciary Duties</u>**

123.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124.    The Individual Defendants have violated fiduciary duties of care, loyalty, good faith, and candor owed to Electro stockholders.

125.    By the acts, transactions, and courses of conduct alleged herein, Defendants individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class the true value of their investment in Electro.

CLASS ACTION COMPLAINT

126.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, independence, and candor owed to Electro stockholders because, among other reasons, they failed to take reasonable steps to obtain and/or ensure that Electro stockholders receive adequate consideration for their stock, agreed to restrictive deal protection devices that deter other suitors from making a superior bid for the Company, and caused a materially incomplete and misleading Proxy concerning the Proposed Acquisition to be filed with the SEC.

127.    By reason of the foregoing acts, practices, and courses of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

128.    As a result of the actions of Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Electro's assets and businesses, have been and will be prevented from obtaining a fair price for their shares of Electro common stock, and will not be able to cast an informed vote the Proposed Acquisition.

129.    Unless the Court enjoins Defendants, they will continue to breach their fiduciary duties owed to Plaintiffs and the members of the Class, all to the irreparable harm of the members of the Class.

130.    Plaintiffs and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiffs and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**SECOND COUNT**
**On Behalf of Plaintiff and the Class**
**Against Electro, Platinum Equity LLC, Merger Sub 1, and Merger Sub 2**
**For Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty**

131.    Plaintiffs incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132.    Electro, Platinum Equity LLC, Merger Sub 1, and Merger Sub 2 have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are

in breach of their fiduciary duties to Electro's stockholders, and have participated in such breaches of fiduciary duties.

133.    Electro, Platinum Equity LLC, Merger Sub 1, and Merger Sub 2 knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.  In so doing, Electro, Platinum Equity LLC, Merger Sub 1, and Merger Sub 2 rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Proposed Acquisition in breach of their fiduciary duties.

**THIRD COUNT**
**On Behalf of Plaintiff and the Class for Violations of Section 14(a)**
**of the Exchange Act and Rule 14a-9 Promulgated Thereunder**
**Against Electro and the Individual Defendants**

134.    Plaintiff repeats all previous allegations as if set forth in full herein.

135.    The Individual Defendants have issued the Proxy with the intention of soliciting stockholder support of the Merger.

136.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. 240.14a-9.

137.    Specifically, the Proxy violates Section 14(a) and Rule 14a-9 because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, the Individual Defendants should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

138.    The Individual Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

139.    The misrepresentations and omissions in the Proxy are material to Plaintiff, and Plaintiff will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Merger.

CLASS ACTION COMPLAINT

140.     Because of the false and misleading statements in the Proxy, Plaintiff is threatened with irreparable harm, rendering money damages inadequate.   Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

**FOURTH COUNT**
**On Behalf of the Plaintiff and the Class for Violations of Section 20(a)**
**of the Exchange Act Against the Individual Defendants**

141.     Plaintiff brings this Exchange Act claim on behalf of himself as individuals and on behalf of all other Electro stockholders.

142.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

143.     The Individual Defendants acted as controlling persons of Electro within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By virtue of their positions as officers and/or directors of Electro, and participation in and/or awareness of the Company operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

144.     Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

145.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Proxy, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.   The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.   They were, thus, directly involved in the making of this document.

146.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger.   The

CLASS ACTION COMPLAINT

Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

147.  By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

148.  As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

WHEREFORE, Plaintiff demands injunctive relief, in his favor and in favor of the Class, and against the Defendants, as follows:

A.  Declaring that this action is properly maintainable as a class action, certifying Plaintiff as Class representative and certifying his counsel as class counsel;

B.  Declaring and decreeing that the Proposed Acquisition was entered into in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable, and rescinding and invalidating any merger agreement or other agreements that Defendants entered into in connection with, or in furtherance of, the Proposed Acquisition;

C.  Preliminarily and permanently enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Acquisition;

D.  Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction that is in the best interests of Electro stockholders;

CLASS ACTION COMPLAINT

1    E.    Imposing a constructive trust, in favor of Plaintiff and the Class, upon any

2          benefits improperly received by Defendants as a result of their wrongful

3          conduct;

4    F.    Awarding Plaintiff the costs and disbursements of this action, including

5          reasonable attorneys' and experts' fees; and

6    G.    Granting such other and further equitable relief as this Court may deem just

7          and proper.

8                    **<u>DEMAND FOR JURY TRIAL</u>**

9    Plaintiffs hereby demand a jury on all issues which can be heard by a jury.

10   Dated: June 20, 2015            **BRODSKY & SMITH, LLC**

11

12                                  By:_____
                                    Evan J. Smith (SBN242352)
13                                  9595 Wilshire Boulevard, Suite 900
                                    Beverly Hills, CA 90212
14                                  Telephone:    (877) 534-2590
                                    Facsimile:    (310) 247-0160
15                                  *Attorneys for Plaintiff*

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT